**ORTHO DIAGNOSTIC SYSTEMS, INC., Plaintiff,**

v.

**ABBOTT LABORATORIES, INC., Defendant.**

**No. 93 Civ. 2656 (LAK).**

United States District Court, S.D. New York.

April 26, 1996.

Robert M. Heller, Jonathan M. Wagner, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for Plaintiff.

Jeffrey I. Weinberger, Steven M. Perry, Henry Weissmann, Garth T. Vincent, Munger, Tolles & Olson, Charles Carberry, Jonathan Lederman, Jones, Day, Reavis & Pogue, New York City, for Defendant.

## MEMORANDUM OPINION DENYING REARGUMENT

KAPLAN, District Judge.

Plaintiff Ortho Diagnostic Systems, Inc. ("Ortho") has moved for reargument of this

Court's recent decision [1] granting (a) defendant's motion for summary judgment to the extent of dismissing certain of Ortho's antitrust claims and (b) denying Ortho's motion for partial summary judgment dismissing certain of defendant's counterclaims. A number of aspects of the motion for reargument were disposed of by an unpublished order. What remains for decision is whether the Court should (a) permit Ortho to expand the record on the prior motion by submitting the entire transcript of the deposition of its expert, Dr. Janusz A. Ordover, and the exhibits thereto, which Ortho did not previously submit, and (b) conclude that Dr. Ordover's deposition testimony is sufficient to raise a genuine issue of material fact warranting denial of defendant's motion for summary judgment dismissing Ortho's Section 2 claims.

As will appear, Ortho has offered no sufficient reason for expanding the record. In any case, however, consideration of all of Dr. Ordover's testimony and the related material leaves the Court convinced that there is no occasion to determine the legal question whether pricing of a package of products that is not "compensatory" under Dr. Ordover's theory violates Section 2. Dr. Ordover's testimony, even if considered in its entirety, would be insufficient to raise a genuine issue of fact as to whether Abbott's pricing was or was not "compensatory."

*The Request to Reopen*

 An application to reopen the record ordinarily will be denied unless the party seeking to expand the record failed to adduce the evidence sought to be added notwithstanding its own due diligence. *See, e.g., John v. Sotheby's, Inc.,* 858 F.Supp. 1283, 1288–89 (S.D.N.Y.1994), *aff'd.* 52 F.3d 312 (2d Cir.1995). The justifications offered by Ortho for its failure to submit the entire transcript are entirely without merit.

First, Ortho's suggestion that the Court's focus on Dr. Ordover's testimony was "unanticipated" (Ortho Mem. 4 n. 6) is irreconcilable with the facts. Abbott's opening brief on the motion for summary judgment anticipated that Ortho would rely on Dr. Ordover's

testimony. (Abbott Sum.Judg.Mem. 34–37) Ortho responded by submitting excerpts from the deposition and arguing that the excerpts warranted denial of summary judgment. (Ortho Sum.Judg.Mem. 72–76)

Second, Ortho claims that it should be given "an opportunity to respond and cure deficiencies" before summary judgment is finally entered against it. But it was Ortho that contended that Dr. Ordover's testimony was pivotal to the motion, and thus it had a full opportunity to present Dr. Ordover's views in whatever form it wished. Moreover, at the oral argument of the motion, the fact that the Court had focused on Dr. Ordover's testimony, as Ortho invited it to do, was perfectly clear. (Tr., Dec. 4, 1995, *passim*) Yet Ortho made no effort to expand the record until the motion was decided against it. Indeed, when the Court suggested the possibility of holding a Rule 43(e) hearing at which Dr. Ordover could testify and be cross-examined, Ortho's counsel indicated his view that such a hearing was unnecessary. Ortho is not entitled to another bite at the apple.

Third, Ortho's implication that its failure to provide support for Dr. Ordover's opinions was justified by an agreement among counsel, approved by Judge Sand, is without merit. The substance of the agreement was simply that the parties, in lieu of providing affidavits during discovery setting forth the substance of expert opinions in order to facilitate depositions of the experts, would exchange the same information by letter. This agreement in no way warrants relieving Ortho of its own decision to rely on a portion of the deposition rather than submit the entire transcript or, for that matter, a coherent affidavit of its expert once a motion for summary judgment dismissing its complaint was made.

Finally, it bears noting that this is not a case in which the Court unexpectedly faulted opinion evidence submitted on the motion on grounds not foreseen by its proponent and therefore on a basis that could have been cured if only the proponent had been given the opportunity. Throughout the litigation of this motion, Abbott consistently attacked Dr. Ordover's testimony on substantially the

---

**1.** *Ortho Diagnostic Systems, Inc. v. Abbott Labo-* *ratories, Inc.,* 920 F.Supp. 455 (S.D.N.Y.1996).

basis upon which the Court has found it wanting. Yet Ortho, for reasons sufficient unto itself, elected not to submit an affidavit, not to submit the entire deposition transcript, and not to meet the substance of Abbott's argument in some other way. It will not now be heard to complain that it should be given yet another chance. It has "had ample opportunity ... to cure any defect ..." WILLIAM W. SCHWARZER, THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS 57 (1991).

### Dr. Ordover's Testimony

■ While Ortho's motion is denied on the basis outlined above, the Court nevertheless has reviewed the entire transcript of Dr. Ordover's testimony. Even if it granted the motion to reopen the record and considered this material, it would deny the motion on the merits.

### Compensatory Pricing Theory

Dr. Ordover's compensatory pricing theory is concerned, at least in one of its applications, with the terms on which a firm with control over a potentially scarce input needed by its competitors should be permitted to sell that input. (38–40 [2]) Dr. Ordover, moreover, sees no meaningful distinction between the standard that ought to govern the sale of a scarce input to competitors and the sale to consumers of a product complementary to products sold by competitors. (40–41) Thus, his theory addresses the question whether the pricing of a package of complementary products in relation to the unbundled prices of constituents of the package is anticompetitive.

The essence of the argument is that the seller's package pricing is suspect, even if the price of the package exceeds its average variable cost, if the seller will derive less profit from selling the package than it would derive from selling the individual components at their unbundled prices. Dr. Ordover began his explication of the theory with a two product example. He assumed that a hypothetical defendant sells a system comprised of two products, A and B. It has competitors in the sale of A, but not B. Its marginal cost for each product is $10. It sells a package consisting of both A and B for $100, and it sells B alone for $95. (43) On these assumptions, the defendant would make $85 profit by selling a unit of B alone, but only $80 by selling a package unless there are cost savings uniquely attributable to selling the package. Since the hypothetical defendant would "lose" $5 of profit by selling the package as opposed to selling B alone, Dr. Ordover argues that the pricing of the package is not "compensatory"—that is, it does not compensate the defendant for the profit lost by the decision to sell the package as opposed to selling B alone. In his view, this pricing therefore arguably is unlawful—despite the fact that both the package and the unbundled prices of B exceed their average variable costs and thus satisfy the Areeda–Turner predatory pricing test—because the most plausible reason for this pricing is to make it too costly for a customer to buy B from the defendant and A from a competitor. (38–46)

The Court assumes *arguendo* that the preceding hypothetical example would raise an issue under Section 2 of the Sherman Act if the defendant had market power over B. But this does not help Ortho in this case for two reasons.

### Application of the Theory in this Case

### The Multiple Package Problem

First, this case involves five complementary products and a number of different packages. Dr. Ordover's movement from the simple two product example to the more complex factual setting of this case raises questions that Dr. Ordover's testimony did not address, even at a theoretical level. In other words, whatever the theoretical validity of his simple example, he has given the Court no comparable basis for analyzing this case.

Once he moved beyond the two product hypothetical described above, Dr. Ordover first addressed the question whether the pricing to the CCBC of Abbott's five test package was compensatory as compared to its unbundled pricing of three of the assays—HIV½, HTLV and HCV. Since the unbundled prices for those three assays total $7.57,

**2.** Parenthetical references to numbers are to pages of Dr. Ordover's deposition.

while the price for the five assay package (including free DMS) is $7.37, Dr. Ordover readily concluded that the pricing of the five assay package was not compensatory in comparison to the price of these three assays. In other words, the price realized by Abbott on the sale of the package—$7.37—is less than the total revenue it would receive from the sale of HIV½, HTLV and HCV, despite the fact that it would incur the added incremental (marginal) cost of supplying the two additional assays (HBsAg and Anti-core) and DMS. Absent economies in selling the package, of which Dr. Ordover saw no evidence, Abbott would sacrifice profit to sell the five assay package in preference to the sale of these three assays. (87–95) He compared also the pricing of the five assay package with the sale by Abbott at unbundled prices of a three assay package consisting of HIV½, HTLV and HBsAg, a comparison discussed in more detail below. The fundamental issue, however, even before proceeding to the manner in which Dr. Ordover performed his comparison, is the relevance of these *particular* comparisons.[3]

The basic point of concern here is whether Abbott's package pricing constituted an inappropriate use of its market power in HIV½ and HTLV, in which it has dominant shares of the market, just as the concern in Dr. Ordover's two product hypothetical is whether the defendant's package pricing of A and B abuses its dominant position in the market for B. In the two product example, the reason for the comparison of the package price to the unbundled price of B directly addresses that concern. Here, however, Dr. Ordover never compared, according to his methodology, the package price of either the four or five assay packages with the unbundled prices of HIV½ and HTLV, whether considered separately or as a pair. (124–25) In each case he considered in the deposition, he added a third product to the group compared with the package—HCV in one instance and HBsAg in another.

The inclusion of a third product with HIV½ and HTLV confounds the analysis. As Ab-

bott does not even arguably have market power in the alleged market for HCV (its share is in the 20 percent to 35 percent range) and faces tough competition in the sale of that product, the unbundled price of HCV—and the difference between the profitability of HCV at the unbundled price compared with its profitability as part of the package—seems beside the point. Yet by including HCV in the comparison, precisely that figure is included in the determination. And while Abbott's share of the alleged HBsAg market is much higher, it is significant to note that Dr. Ordover does not claim that Abbott has market power in that product either. (Ordover Ex. 1)

Dr. Ordover acknowledged also that one of the two three product groups he compared to the five assay package—that consisting of HIV½, HTLV and HCV—was not particularly relevant because it was unrealistic.

"The only point I'm making here, you take this package which includes these two tests that I believe everybody at that time was convinced they had to take from Abbott [HIV½ and HTLV], and look at the package that adds another one to that base of two, and compare that to the package of five. The simple analysis says it's noncompensatory. I'm not done. In other words, I don't want to get up and say, look, here it is, the whole thing collapses because of some package which may or may not be realistic one is priced in a noncompensatory fashion. So I want to verify the pricing structure on the three to five comparison on bundles that may or may not be more realistic. . . .

"The reason I started with that package is because it's the simplest one to understand and it does not require any complex adjustment . . . to demonstrate that it failed that obvious test.

"So now we want to move on, right, you want to move on to the, what you may characterize as a more realistic package." (93–94, 95)

The Court understands the relevance, in terms of Dr. Ordover's theory, of comparing

---

**3.** Dr. Ordover spoke also of a preliminary and uncompleted effort to compare the four and five assay packages. (132–50) He readily acknowl- edged his inability to reach any conclusion on that point. (147)

the unbundled prices of HIV½, HTLV, and the total of the two with the package prices. But Dr. Ordover did not explain why the comparison of the unbundled prices of any group of three assays with the package price has any proper bearing here.[4]

### The Lack of Incremental Cost Data

The perhaps more glaring deficiency in the analysis is in its application, even assuming that the compensatory pricing theory is correct in principle and that the comparison of three assay groups with the five assay package was appropriate. This is clear from Dr. Ordover's comparison between the five assay package and the unbundled pricing of the group consisting of HIV½, HTLV and HBsAg.

The first step in Dr. Ordover's comparison was to determine the added revenue generated by Abbott when it sells a five assay package for $7.37 as compared to a group of HIV½, HTLV and HBsAg at the unbundled prices. When HCV and Anti-core are added to the other three tests at bundled prices of

$2.90 and $0.85, respectively, the added revenue attributable to moving from the purchase of five rather than three tests is $3.75. Of course, the addition of the HCV and Anti-core tests costs something, so Dr. Ordover's theory calls for the subtraction of the incremental cost of those two assays as part of the process of determining the added profit or loss generated by moving from the three assay group to the five assay package. And it is in the treatment of these and other cost elements that Dr. Ordover's testimony falls short of creating a genuine issue for trial, even assuming the validity of his theory.

Dr. Ordover admitted that he did not know Abbott's incremental costs for HCV and Anti-core, saying that "it's very hard to actually get a good handle on what the incremental costs are for these two assays ..." (101) Nevertheless, he assumed that the combined incremental cost was $1.49, which he characterized as a "guesstimate."[5] (101, 108) By subtracting this figure from the $3.75 in incremental revenue yielded by the addition of HCV and Anti-core, he reduced the incre-

---

**4.** Moreover, there are nine possible groups of three tests that can be created from a universe of five. He made no effort to explain why any particular groups are or are not relevant to this exercise and offered no testimony at all about seven of the nine.

**5.** At another point, Dr. Ordover said that he used Abbott's standard cost figure and arbitrarily "took some cents off ... the standard cost." (105; 247–48) The record fails to establish, however, that the use of standard cost, with or without an arbitrary deduction, was appropriate.

The object of the antitrust exercise is to determine the marginal cost of an additional unit of production, a proposition with which Dr. Ordover agreed (*e.g.*, 62–64). The lack of correspondence between usual accounting measures of cost and marginal cost is well known. Indeed, this is the basis for the widespread use of average variable cost as a surrogate for marginal cost. *See, e.g., MCI Communic., Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1114–15 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 87, 88 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); III PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW ¶ 715c (1978). Accordingly, courts repeatedly have rejected, as a matter of law, predatory pricing claims that rested on standards that were not limited to variable costs. *See, e.g., Int'l Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1395–96 (8th Cir.), *cert. denied*, 510 U.S.

932, 114 S.Ct. 345, 126 L.Ed.2d 309 (1993) (setting aside verdict where only evidence of predatory pricing was of sales below average total cost); *William Inglis & Sons Baking Co. v. Continental Baking Co.*, 942 F.2d 1332, 1336 & n. 6 (9th Cir.1991) (setting aside verdict because only evidence of below cost pricing failed to limit costs to those "uniquely incurred" in output increase in allegedly predated product), *mod. on other grounds*, 970 F.2d 639 (9th Cir.1992); *MCI*, 708 F.2d at 1119–23 (rejecting use of fully distributed cost); *Southern Pac. Communic. Co. v. Am. Tel. & Tel. Co.*, 556 F.Supp. 825, 922 (D.D.C. 1982), *aff'd*, 740 F.2d 980, 1004 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985) (rejecting use of fully distributed cost in favor of average incremental cost). Standard cost systems are management control tools that may or may not include overhead costs in their standard cost figures. *See, e.g.*, MYRON J. GORDON & GORDON SHILLINGLAW, ACCOUNTING: A MANAGEMENT APPROACH c. 19–20 (1964). In consequence, the extent to which "standard cost," as used in a particular company, approximates marginal or average variable cost, if at all, depends upon the details of its specific system. As there was no evidence here as to the determination of Abbott's standard costs, there is no basis for concluding that they are cost measures relevant to the purpose to which they were put here. Indeed, Dr. Ordover flatly acknowledged that he was "not in a position to decipher Abbott's cost accounting documents" upon which he relied. (103)

mental profit derived from sale of the package from $3.75 to $2.26 (which he rounded off to $2.25). (108–09)

The next step reflects the fact that the movement from purchasing three assays at unbundled prices to buying the whole package gives the customer a discount on those three assays, HIV½, HTLV and HBsAg (*i.e.,* from $2.47 to $1.93 for HIV½, $1.57 to $1.03 for HTLV, and $1.20 to $0.66 for HBsAg). This discount, which aggregates $1.62, must be subtracted in determining the incremental profit or loss incurred by moving from the three assay group to the full package, which leaves incremental profit from making that movement of $2.25–$1.62, or $0.64. If this were the entire analysis, Dr. Ordover conceded, the pricing of the package in comparison to the group of three assays would be compensatory. (110–11) The five assay package, however, includes DMS, so the incremental cost of providing DMS to the package purchasers, according to Dr. Ordover, must also be deducted. (111) And here the comparison went off the rails entirely.

The only information Dr. Ordover had concerning Abbott's DMS costs was a document indicating that the capital costs of installing or maintaining (Dr. Ordover could not recall which) DMS in a center was $5,200 per month, or approximately $62,000 per year. He then assumed that a center tests 100,000 blood draws per year (which seems to be an estimate favoring Abbott, as the actual volumes often are lower), which resulted in a cost for DMS of $0.62 per test that he deducted from the $0.64 figure previously obtained. (114–19, Ex. 2) This would leave Abbott deriving $0.02 per test greater profit from selling the package than from selling the components at the unbundled prices, which would make the package pricing compensatory. Dr. Ordover proceeded to assume that other costs, such as writing of software upgrades and provision of equipment, would "eat two cents up or more." (119–22)

The fundamental difficulty with this analysis is simple. Dr. Ordover testified that, for purposes of the compensatory pricing analysis, the relevant figure is the incremental cost of providing the DMS. (116) He acknowledged also that he had "no idea" whether the $5,200 per center cost figure he used in the analysis represented incremental cost, fully loaded cost, or something else.[6] (115–16) Indeed, he agreed that he had to account for the $5,200 cost "[i]f those are the right numbers for incremental costs." (118) More generally, he acknowledged that all of his testimony was "hampered ... by the fact that not all the data [he] need[ed was] available." (150; *see also* 170–71)

Even if Dr. Ordover's compensatory pricing standard were the measure of the legality of Abbott's pricing, and assuming further that the comparison of the three and five test packages is a relevant comparison for purposes of analysis, this testimony demonstrates that Dr. Ordover had no sufficient basis for concluding that Abbott's pricing of the five test package was not compensatory. His opinion was based upon factual assumptions concerning incremental costs. He did not himself express the opinion that the figures he used in his exposition in fact reflected Abbott's incremental costs; he simply took the view that the pricing was not compensatory *if* they did. Ortho offered no proof sufficient to justify a trier of fact in concluding that the assumptions were accurate. Accordingly, Dr. Ordover's testimony is insufficient to create a genuine issue of fact material to the disposition of this motion.

This conclusion does no violence to principles governing motions for summary judgment and expert testimony—indeed, it is compelled by them. FED.R.CIV.P. 56(e) requires that evidence in support of and in opposition to motions for summary judgment "set forth such facts as would be admissible in evidence ..." Accordingly, affidavits or other testimony of expert witnesses must, among other things, be relevant, satisfy FED. R.EVID. 702's requirement that they "assist the trier of fact to understand the evidence or to determine a fact in issue" and, given FED.R.EVID. 703, rest on facts "perceived by or made known to the expert" which are

6. As noted, much of same is true with respect to the other cost elements.

"reasonably relied upon by experts in the particular field ..."

Here, Dr. Ordover's testimony was offered for two purposes: (1) to assist the Court in formulating the legal standard against which Abbott's conduct should be assessed, and (2) to demonstrate that Abbott's pricing did not conform to the standard advocated by Dr. Ordover. The fact that Dr. Ordover had no information, reliable or otherwise, or opinion as to Abbott's incremental costs—most particularly, but not exclusively, the incremental cost of providing DMS to package purchasers—demonstrates that his testimony was inadmissible for the second of these two purposes; the opinion he offered that the pricing of the five test package was not compensatory, however it may be characterized, did not rest on facts "perceived by or made known to" him, much less facts which are "reasonably relied upon by experts in the particular field ..." Accordingly, the testimony to that extent is not admissible under Rule 703. Even if it were, a trier of fact could not reasonably conclude from it that Abbott's pricing was not compensatory as Dr. Ordover defines that concept.

To the extent Dr. Ordover's testimony was offered for the first purpose—to assist the Court in determining the appropriate standard against which to measure the legality of Abbott's pricing—it raises a different question. Certainly antitrust courts have considered expert testimony by economists in giving content to the broad language of the antitrust statutes. In consequence, the testimony is relevant. But to this extent it is directed at persuading the Court with regard to an issue of law, not an issue of fact. *See, e.g., Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 87 (2d Cir.1981) (determination of appropriate measure of cost for use in predation analysis is "legal question"), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). Moreover, in view of the fact that the Court has determined that Dr. Ordover's testimony is not an adequate basis for any conclusion that Abbott's pricing was not compensatory, it need not decide in this case whether Dr. Ordover's theory ought to be used in determining the legality of pricing under the relevant statutes.

### Conclusion

The motion is denied in all respects. The Court wishes to make clear, however, that this opinion is not intended to reflect adversely on Dr. Ordover or his work.

The deposition was conducted early in the litigation at a time when the parties were rushing to prepare for a then imminent trial. Dr. Ordover freely acknowledged the limits on the nature and extent of his efforts, which were dictated by the timetable. After the deposition, however, for reasons not material here, the trial did not go forward and the case took on a more measured pace. Nevertheless, Ortho and its counsel elected to rest on Dr. Ordover's deposition. Had they thought it appropriate, they certainly could have asked Dr. Ordover to complete his analysis and prepare an affidavit explicating his views. They could have requested Dr. Ordover to compare the unbundled pricing of the two assays in which, in Dr. Ordover's view, Abbott had market power with the package prices or, alternatively, to explain why such a comparison would not have been significant if indeed that is his view. Even more important, it was well within Ortho's abilities to obtain through discovery and analysis information concerning Abbott's incremental costs that would have permitted Dr. Ordover to offer an opinion, based on something more than back-of-the-envelope "guesstimates," as to whether Abbott's pricing was compensatory. There is nothing before the Court to suggest that the failure to take these steps was attributable to Dr. Ordover.

SO ORDERED.