**PLAYBOY ENTERPRISES, INC., et ano., Plaintiffs,**

v.

**Jennifer DUMAS, et.ano, Defendants.**

**No. 91 Civil 6268(LAK).**

United States District Court, S.D. New York.

March 26, 1997.

Kenneth P. Norwick, Norwick & Schad, New York City, for Plaintiffs.

Roger L. Zissu, Lisa S. Pearson, Howard M. Rogatnick, Weiss Dawid Fross Zelnick & Lehrman, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Many works of the late Patrick Nagel, a noted artist, were submitted to and appeared in *Playboy*. This case is a dispute between Nagel's widow and *Playboy* as to ownership of the copyrights in approximately 285 of these works.

The action began in September 1991, when plaintiffs Playboy Enterprises Inc., and Special Editions Ltd. (collectively "Playboy") sought a declaratory judgment that they are the owners of the copyrights. Defendants Jennifer Dumas and Jennifer Dumas, Inc. (collectively "Dumas"), Nagel's widow and the corporation to which Dumas assigned her copyrights, if any, in Nagel's works, opposed plaintiffs' claims and counterclaimed for infringement.

After a bench trial, the late Judge Tenney of this Court dismissed Playboy's claim for a declaratory judgment and granted judgment for defendants on their copyright infringement counterclaim. *Playboy Enterprises, Inc. v. Dumas,* 831 F.Supp. 295, 299 (S.D.N.Y.1993). The Second Circuit affirmed in part, reversed in part, and remanded to this Court for further findings on a number of issues. 53 F.3d 549, 551–52 (2d Cir.1995). The case is before this Court pursuant to that remand. In addition, the Court must pass on Playboy's motion to reopen the trial record to present further evidence. As the facts of the matter have been set forth extensively in the prior opinions of Judge Tenney

and the Second Circuit, familiarity with which is assumed, they will not be restated here, and the Court proceeds directly to determination of the issues now before it.

## Discussion

The ultimate issues for decision are whether each of two groups of Nagel's works—those created in the period January 1977 to January 1978 and those created from July 1979 through 1984, respectively—were works for hire and, if so, whether persons who endorsed checks acknowledging the existence of a work for hire relationship were authorized to do so. The issue of authorization, however, affects only the second group of works.

### Nagel's Paintings Were Made at Playboy's Instance

The first group of works at issue, having been created prior to January 1, 1978, is governed by the Copyright Act of 1909, 17 U.S.C. § 1 *et seq.* (repealed), while the second group falls under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

■■ Under the 1909 Act, "an independent contractor is an 'employee' and a hiring party an 'employer' for purposes of the statute if the work is made at the hiring party's 'instance and expense'" provided also that the employer had the right to exercise control over the manner in which the artist executed the work. 53 F.3d at 554 (quoting *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567–68 (2d Cir.1966)). Under the 1976 Act, insofar as is relevant here, the works at issue were made for hire if they were "specially ordered or commissioned" by Playboy and the parties "expressly agree[d] in a written instrument signed by them that the work[s] shall be considered" works made for hire. *Id.* at 558. The Court of Appeals held in this case that "the phrase 'specially ordered or commissioned' has essentially the same meaning as 'instance and expense'" save that "the hiring party need not possess or exercise artistic control ..." *Id.* at 562. As the Second Circuit already has decided that all of the works at issue were made at Playboy's expense, the first of the questions remaining for this Court is whether they were made at Playboy's in-

stance. At the outset, however, two threshold questions that affect the determination of this question must be resolved.

### Factors Bearing on the Instance Inquiry

#### 1. Control

The first of these issues relates to the scope of the remand with respect to the works subject to the 1909 Act, those created in the period January 1977 until January 1978.

Dumas argues that this Court must determine not only whether those works were created at Playboy's instance, but whether Playboy had the right to control the execution of the work. "Playboy must still establish that its control and supervision over the creation of the work [*sic*] in order to prevail on remand with respect to the 1909 Act works in issue. 53 F.3d at 554." (Def. Reply Br. 3 n. 1) Playboy implicitly treats the issue of control as beyond the scope of the remand. The Court concludes that Playboy is correct.

The circuit said in this case that a work is made at the instance and expense of the hiring party "when the motivating factor in producing the work was the employer who induced the creation." *Id.* at 564 (quoting *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir.1974). As noted, it went on to say that "an essential element of the employer-employee relationship, [is] the right of the employer to direct and supervise the manner in which the writer performs his work." *Id.* (internal quotation omitted). In affirming Judge Tenney's conclusion as to the pre–1977 works, it relied in part upon his finding that Playboy "actually controlled certain characteristics of [those] paintings," noting that the combination of this fact with the paintings having been "made at Playboy's 'instance and expense'" made those works for hire. *Id.* at 556. It thus made clear that the hiring party's right to control the manner in which the work is carried out is indispensable to a work for hire relationship under the 1909 Act. Yet in the very next sentence of its opinion, the panel remanded the case only "for a determination of whether the paintings made after January 1977 but before January 1, 1978

were also made at Playboy's instance." *Id.; accord, id.* at 565.

It is not entirely clear why the Court did not refer to the issue of control in framing the issues remanded. Nevertheless, it clearly distinguished between "instance and expense" on the one hand and control on the other at a number of points in its opinion. It limited the issue on remand to "whether the paintings made after January 1977 but before January 1, 1978 were also made at Playboy's instance" in explicit terms at two separate points in the opinion. *Id.* at 556, 564. This Court is bound to confine itself to the scope of the remand framed by the Court of Appeals. Accordingly, it does not address Dumas' contention that Playboy failed to establish that it had the right to exercise control over Nagel's work with respect to the works created in the period January 1977 until January 1978.

### 2. The Significance of the Parties' Course of Dealings

The other preliminary point at issue is the proof properly considered in determining whether works were made at Playboy's instance, *i.e.*, whether Playboy was the "motivating factor" in their creation. Dumas argues that the determination must be made separately as to each work on an individual basis. She would have the Court reject arguments based on the course of conduct between the parties, contending that copyright ownership may not be established "on the basis of generalized conduct, patterns or relationships" and citing *Weissmann v. Freeman*, 868 F.2d 1313, 1317 (2d Cir.), *cert. denied*, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989). (Dumas Reply Mem. 1)

 Dumas misreads *Weissmann* and ignores the Court of Appeals' decision in this case. *Weissmann* held only that ownership of the copyright to one work in a series does not alone establish ownership of copyrights in later works in that series. It does not mention, much less prohibit, using the course of conduct between the parties to determine which was the motivating factor in the creation of a particular work. Moreover, the circuit in this case did exactly that. In framing the issue for determination on remand,

the Court of Appeals explained that "[t]he question is whether *under this course of conduct* Playboy was the motivating factor behind the creation of the paintings." *Id.* at 563 (emphasis added). Further, the panel's analysis relied heavily on the course of conduct between the parties in lieu of assessing evidence on a work-by-work basis. *E.g., id.* at 556, 563. Accordingly, this Court is free to consider evidence of any pertinent course of conduct between the parties to the extent it finds it persuasive.

### Evidence of Motivation

 Having disposed of these preliminary matters, the Court turns to the question whether the works submitted to Playboy by Nagel that are at issue on this remand were made at Playboy's instance. The evidence, in this Court's view, is exceptionally strong.

### 1. Testimony

Persuasive evidence that Playboy was the motivating factor in Nagel's creation of the works in question comes from the testimony of Jennifer Dumas herself, who testified that Nagel "had to come up with 3 paintings a month, and to do something different each month for Playboy in a sort of sexy context was kind of difficult. So we would sort of sit around trying to figure out what he would do next." (JA 564)

This statement establishes that Nagel quite consciously created paintings each month "in a sort of sexy context" specifically for Playboy. The fact that Dumas stated that Nagel "had to" create these paintings for Playboy leads this Court to conclude that he felt obligated to create at least one painting a month specifically for Playboy and that the content of those paintings was motivated by Playboy's need for "sexy" material. The fact that Nagel found it difficult to come up with these paintings further illustrates that he was not simply self-motivated, but was motivated specifically to create paintings for Playboy, the content of which did not always come to him easily. Dumas' testimony strongly suggests that Nagel would not have created the particular paintings he submitted

to Playboy had he not been motivated by his relationship with the magazine.[1]

The testimony of Playboy's Tom Staebler further supports the finding that the creation of the 1909 Act works was motivated by Playboy. Staebler established that Playboy exercised a great deal of influence over the style of Nagel's work at the beginning of the relationship and that this influenced all of the work created over the relationship. (JA 564–68) Most importantly, Staebler attested to the magazine's motivating influence by detailing the implicit agreement between painter and publisher. Staebler stated that "at some point we told Patrick we are going to be running this and it looks like this is going to be a regular feature." *Id.* Although he conceded that there was no express contract and that Nagel at no time had any obligation to submit to Playboy anything beyond the then-pending assignment, the fact that there were "assignments" at all, taken in conjunction with Staebler's acknowledgment that Nagel "was a regular contributor to certain sections of the magazine" (JA 3750–51), suggests that the magazine had an implicit agreement with Nagel. The existence of this implicit agreement was supported also by Dumas' testimony and leads this Court to conclude that the parties understood that Nagel would submit one work each month. This implicit agreement was one of the reasons listed by the Court of Appeals as persuasive proof of Playboy's motivational role, and this Court finds that to be true as well. *See* 53 F.3d at 563.

### 2. *Financial Dealings Between the Parties*

The parties stipulated that Playboy paid its artists $250 for a spot illustration, $800 for a full page illustration, and $1200 for a spread. (Stipulated Fact 36). The evidence at trial showed that Nagel was paid the full rate for 20 to 30 paintings that Playboy never published. *Id.* at 563. The evidence showed further that Nagel on a number of occasions was paid a "turn-down" fee for work that was not accepted by Playboy.[2] (JA 2200, 2202, 2203, 2211; *see also* Pl.Br. 22)

Playboy claims that its payments for unused work show that it requested a submission from Nagel each month because it paid him for his work whether it was used or not. Playboy further notes that if it paid Nagel only for one-time use of the works, as Dumas claims, it would have had no reason to pay Nagel for works that never were published. Dumas, on the other hand, argues that Playboy's turn-down fee policy was inconsistent with a work-for-hire arrangement because if the works actually were made under a for-hire agreement, Playboy, rather than the artist, should have owned the copyrights. Dumas argues also that the relatively meager amount of the payments to Nagel, while not relevant to the determination of whether the works were made at Playboy's expense, show that Playboy could not have been the motivating factor in his creation of the disputed works.

This Court accepts Playboy's argument that its payments for unused work show that it at least implicitly requested Nagel to submit at least one painting a month and that it therefore was the motivating factor in the creation of those paintings. The persuasiveness of this argument was specifically noted by the Second Circuit in its instructions on remand, where it stated that "Playboy's payment for paintings which it did not publish

---

1. Dumas, perhaps perceiving that her trial testimony hurts her position on this issue, argues that she was not competent to testify to this issue because of a stipulated fact which provided:

"At all times relevant to this case, Dumas was not involved in Nagel's relationship with Playboy. She is unable to testify as to (a) any communication between Nagel and Playboy; (b) the legal and contractual nature and substance of Nagel's relationship with Playboy; (c) the legal and contractual nature and substance of Nagel's relationship with his artist's representatives and his accountants; and (d) any understanding that Nagel had concerning

his relationship with is artist's representatives and his accountants." (JA23)
This stipulated fact says nothing about Dumas' knowledge of Nagel's motivation tor creating the paintings at issue, and her statement at trial shows that she in fact had knowledge about his creative process. In any case, the evidence is in the record, and the Court is entitled to rely on it.

2. Playboy neither made nor makes any claim to copyright ownership in the rejected works for which turn-down fees were paid. (JA 1031–32; *see also* Pl.Br. 22)

would support the conclusion that the parties understood that Playboy implicitly requested paintings each month." 53 F.3d at 563. It is supported also by the testimony of both Dumas and Staebler to the effect that Nagel and Playboy understood that Nagel was to submit at least one painting a month in a style particularly suited to Playboy's readership.

The fact that Playboy made payments for unused work undercuts also one of Dumas' main arguments. Dumas claims that Playboy's payments to Nagel must have been for the right to one-time use of the disputed works because is all that Playboy required. But if Playboy never published a work at all, there would have been no reason to pay anything for it absent a for-hire relationship, as it would have had no need for any rights in such a case. The logical conclusion, and the one to which this Court comes, is that Playboy paid Nagel for works it did not use because he created them at its instance.

Dumas makes a number of arguments relating to the amount of compensation paid to Nagel. She argues that the amount paid to Nagel had no relation to his cost of production or the market or artistic value of the works submitted, that it bore no relation to the "risk of creation" of the works, and that the payments were lower than other magazines' payments for such works. Her argument seems to be that the payments from Playboy were inadequate to serve as a motivating factor and that Nagel would not have created works at Playboy's instance for such remuneration.

The Court of Appeals rejected consideration of the amount of compensation in analyzing whether the expense prong of the instance and expense test was met. However, even assuming that the amount of compensation might bear on determination of whether the putative hiring party was the motivating factor in the creation of a work, it is not persuasive in this case. The record here shows that Nagel was motivated to create works at Playboy's instance for reasons that were not exclusively or perhaps even substantially financial, so the amounts of Playboy's payments are not very probative of what motivated Nagel.

Dumas' direct testimony established that Nagel regularly submitted works to Playboy for reasons that had relatively little to do with money. She stated that Nagel at first took the Playboy work because the exposure and publicity helped his career and that these benefits outweighed the poor compensation. When further questioned as to why Nagel continued to take the Playboy work after he was a nationally recognized artist, Dumas explained:

"It was his philosophy never to turn down a job. He had this kind of fear, as a lot of freelance illustrators have, of thinking that if I turn this one down something might happen and tomorrow I might be broke and I will never get another job again, so I don't think he ever turned down any job." (JA 877–78)

The record thus makes clear that Nagel was motivated, at least in part, to create paintings for Playboy out of a desire for publicity and; later, a desire to retain a secure market. The size of the payments therefore does not undercut the conclusion that Playboy was the *motivating factor* behind the creation of these works.

### 3. The Works Themselves

*Subject Matter.* Many of the 1909 and 1976 Act works depict precisely activities described in their accompanying text. Playboy argues that the correspondence between the subjects of Nagel's artwork and the nearby text shows that it specifically directed Nagel, during 1977 and thereafter to create a number of the illustrations he submitted. Playboy thus was the motivating factor in the creation of these works. Dumas counters that the Second Circuit specifically referred to a number of factual findings made by Judge Tenney to the effect that "Playboy apparently was no longer controlling characteristics of the works by mid–1978," 53 F.3d at 556; *see also id.* at 563. Dumas claims that these statements preclude this Court, under the doctrine of law of the case, from concluding that Playboy specifically requested works after mid 1978.

▌ The doctrine of law of the case dictates that the unreversed factual findings

and legal conclusions of another court in the same case should not be disturbed absent changed law, changed circumstances or clear error. Application of the doctrine is a matter within the Court's discretion. *Sagendorf-Teal v. County of Rensselaer,* 100 F.3d 270, 277 (2d Cir.1996).

■ Playboy resists application of the law of the case doctrine by arguing that the statements relied upon by Dumas were "tentative assumptions" by Judge Tenney and the Court of Appeals. Its argument is not frivolous. Judge Tenney made no finding as to whether the works were created at Playboy's instance because he based his holding on the conclusion, subsequently overturned, that the works were not made at Playboy's expense. Thus, his findings of fact on this point were not necessary to the resolution of the issues before him. Moreover, there is substantial evidence pointing to a different conclusion.

In coming to his conclusion regarding Playboy's lack of specific requests after 1978, Judge Tenney appears to have relied heavily on a statement by Hugh Hefner, Playboy's founder and publisher, to the effect that:

> "[a]t first, we asked [Nagel] to illustrate a particular letter to the 'Advisor' every month, but soon it was clear that trying to funnel such a large talent so narrowly was like telling Irwin Shaw or Ray Bradbury what to write about. We asked him to give us a painting a month. As it turned out, the painting he gave us invariably illuminated one, two, three or all of that month's 'Advisor' letters in a way no commissioned illustration ever had." 831 F.Supp. at 310.

Although Hefner spoke in sweeping terms, his statement actually referred only to the "Advisor" feature. Nagel's work for Playboy included illustrations for the "Forum" and "Playboy Sex Poll" sections in addition to the "Advisor." Playboy does not argue that any "Advisor" illustrations were specifically requested after 1977. However, it claims that many of the paintings accompanying certain "Forum" or "Sex Poll" articles bear far too

close a relation to the subject matter for the illustrations not to have been requested by Playboy.

The Court concludes that many if not most of the illustrations that appeared in the "Forum" and "Sex Poll" features simply are too specific and depict subjects too unusual for Nagel to have created them absent some input from Playboy. This Court finds it impossible to believe, for example, that Nagel would have been motivated to depict a woman wearing a bustier with a dollar bill tucked into her cleavage and standing in front of a Form 1040 unless he knew that he was supposed to create an illustration for an article dealing with a prostitute's tax issues or some closely related topic. (Jan.1981; JA 1795) Likewise, the Court sees no reason that Nagel would have been inspired to depict a park ranger standing behind a man and a woman smoking what appears to be a marijuana cigarette unless he had some word of the content of the article which was to accompany his illustration. (May 1979; JA 1574) The same is true for the illustrations of a woman straddling a sink (Sep.1978; JA 1469), a man with a parrot perched on his back (Nov.1978; JA 1508), a bikini-clad woman operating a belt sander (Feb.1979; JA 1540), a partially clad couple falling out of a tree (Apr.1979; JA 1564), a woman wearing a radio headset (Oct.1980; JA 1751), a woman wearing a "no" button (Jun.1981; JA 1827), a woman licking stamps (Apr.1982; JA 1923), a bare-chested man in a racing helmet next to woman smoking a cigarette (May 1982; JA 1926), a man dressed as a minister standing next to a woman removing a bikini top (Aug.1982; JA 1953), a man in a tuxedo with the crotch cut away (Oct.1982; JA 1979), a woman with horns and a pointed tail hiding behind a record album (Dec.1982; JA 1991), and a naked woman standing in front of a hammer and sickle (Apr.1983; JA 2020), all of which very specifically depict activity described in the accompanying text.[3]

Thus, Judge Tenney's conclusion that Playboy made no specific requests of Nagel

---

**3.** This by no means is an exhaustive list. A number of other, persuasive examples which represent almost every month from 1978 until Nagel's death, are presented in Playboy's Memorandum. (Pl.Mem.24–35)

after mid–1978 appears too categorical. Playboy must have had some input with regard to the content of many illustrations accompanying "Forum" and "Sex Poll" articles. This does not mean, however, that this Court must reconsider Judge Tenney's previous finding that no specific orders were made by Playboy after mid–1978. The similarities between the paintings and articles, however, may be viewed as strong proof of the fact that Nagel was told the subject matter of certain articles that Playboy intended to print, which is not the same thing as Playboy specifically ordering Nagel to illustrate any particular article.[4] Hence, while the Court assumes that Playboy did not give specific orders even for the "Forum" and "Sex Poll" art, it finds the similarity between those works and the accompanying text to be evidence that Playboy was the motivating factor in the creation of those paintings. Moreover, although Playboy's input has not been proved as to every one of these paintings, this Court finds that the evidence of specific input motivating many of the works is illustrative of Playboy's status as the motivating factor for all of the paintings created during this time period. *See* 53 F.3d at 555–56 (concluding that because some articles were specifically requested, all paintings created during the time period were motivated by Playboy).[5]

*Size of the Works.* Playboy's status as the factor motivating the creation of these works is supported also by their physical characteristics. The evidence, based on Nagel's personal holdings at death, shows that the works that Nagel submitted to Playboy were considerably smaller than his other artistic output. A catalogue of the works in Nagel's possession at his death was presented at trial. The catalogue shows that the works created for Playboy that Nagel possessed at his death generally were of a similar size, and were substantially smaller, than most of the paintings he created on other subject matter.

Dumas argues that this comparison is unfair because it does not take into account all of the works created by Nagel in his lifetime or the similarities between some of the Playboy works in Nagel's possession and those referred to as miscellaneous. The Court nevertheless is satisfied that the size difference, though merely inferential, does have some relevance in proving that Playboy was the motivating factor in the creation of the paintings. In fact, Dumas, in her testimony at trial, corroborated the assertion that Nagel used a different size in creating works for Playboy than he did for personally motivated works. (JA 869)

*Regular Use of Nagel's Paintings by Playboy.* The Court of Appeals noted also that Playboy's position is supported by the fact that every issue of Playboy from August 1975 to July 1984 contained at least one Nagel illustration. This evidence, coupled with the fact that Nagel believed that he had a responsibility to submit paintings to Playboy and his knowledge that Playboy considered his submissions a "regular feature" of the magazine show that there was an implicit agreement that Nagel would submit at least one painting a month to Playboy. The evidence of this implicit agreement, combined with the other evidence that Playboy was the motivating factor in the creation of the disputed works, supports the view that these works were made for hire.

### 4. Other Arguments

Dumas presents a number of additional arguments on the motivating factor issue. While some of them are not without merit, they are not substantial enough to overcome Playboy's convincing proof.

Dumas points out that Playboy had no duty to publish any of Nagel's works and had no commitment to continue their relationship from month to month. The Second Circuit

---

4. In addition to its argument regarding law of the case, Dumas points out that Playboy has not presented any evidence to show that the text was not created by Playboy to match the illustrations. While this scenario is factually possible, the illustrations described above are of subject matter that is too unusual to believe that Nagel would have created them on his own.

5. The Court's finding on the motivating factor issue would be the same without the evidence discussed above because of the implicit agreement between the parties that Nagel would submit at least one work to Playboy each month.

recognized that this feature of the relationship was one factor which weighed for a finding that the works were not created at Playboy's instance. 53 F.3d at 563. However, the circuit made clear that the lack of commitment from Playboy did not alone preclude a for-hire relationship. *Id.* The evidence demonstrates that Nagel felt a responsibility to submit one painting to Playboy each month, done in a particular style that was motivated by Playboy, and that one of his works appeared in each issue of Playboy for almost a decade. These facts show that the parties felt a responsibility toward one another despite the lack of a formal commitment. Further, Staebler testified that Playboy informed Nagel at some point that his submissions were going to be a "regular feature" of Playboy. Hence, despite the admitted lack of commitment between the parties, this Court's conclusion is unchanged.

The facts that the works in question were created "in an independent manner and style that was Nagel's own" (Dumas Br. 38) and that he "created his paintings without any financial commitment or support from Playboy" (*id.* 39) and "in his own studio, with his own supplies and with his own hired assistants" (*id.*) is presented by Dumas as proof that the works were not motivated by Playboy. The fact that the paintings were made at Nagel's cost with his own funds and support system has some relevance as to who motivated the works, but even taking into consideration the fact that Playboy did not underwrite the creation of the works, the Court finds that they were motivated by Playboy. Likewise, it stands to reason that the works were created in Nagel's own style. Playboy probably hired Nagel over other illustrators precisely because of his unique style. The fact that Playboy did not give input regarding Nagel's style throughout the relationship does not preclude a finding that the works were made for hire.

Finally, Dumas argues that Playboy knew that Nagel had an agreement with another publisher to bring out prints of his works and that its employees attended an art show at which some of these artworks were displayed. The Second Circuit noted that an independent market existed for Nagel's work

after a time and that this was a factor favoring Dumas. Nevertheless, while the existence of an independent market for Nagel's works might have diminished the economic motivation that Playboy provided for his work, it has been shown that Nagel created works for Playboy for a number of reasons that had nothing to do with money. Thus, while the fact that Nagel's career was booming does weigh in Dumas' favor, it is not more persuasive than the evidence supporting Playboy's argument.

In sum, this Court finds that the works created by Nagel from January 1977 to January 1, 1978 were made at Playboy's instance for the reasons explained above. These works thus were works for hire, with Playboy as their author. No agreement to the contrary is alleged, and so Playboy owns the 1909 Act works which still are in dispute. For the same reasons, the works created from July 1979 until Nagel's death also were made at Playboy's instance and so were "specially ordered or commissioned works" under the 1976 Act. If the statutory writing requirement was satisfied, they too are works made for hire and are the property of Playboy.

### B. 1976 Act Writing Requirement

#### 1. Nature of the Requirement

The 1976 Act set up a detailed system for establishing that a particular work is made for hire. A work-for-hire not created pursuant to an employment relationship must be "specially ordered and commissioned" and the parties must "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 201(b)(2) (1988). No one suggests that there was an employment relationship between these parties.

Playboy included legends on its payment checks which stated that endorsement of the check constituted the signing party's assent to a contract, the terms of which were specified by the legend on the check. The Court of Appeals found that the legends used by Playboy from September 1979 until Nagel's death (which it referred to as Legends B and C) "contain language sufficient to meet the

writing requirement."[6] The panel further held that the circumstances of the endorsement of the payment checks supported the conclusion that "beginning with the second check containing Legend B, Nagel's endorsement of Playboy's check constitutes sufficient evidence that the parties agreed before the creation of each work that it would be made for hire." 53 F.3d at 560.

The panel noted that Nagel did not endorse all of the checks himself and explained that its conclusion rested on the assumption that the endorsements were made by "agents with actual authority to enter into a work for hire agreement on Nagel's behalf." 53 F.3d at 561 (as amended). It therefore remanded to this Court the issue of whether the persons who endorsed the checks on Nagel's behalf had such actual authority.

### 2. Actual Authority

The parties stipulated that the first 64 checks bearing Legend B were not signed by Patrick Nagel. Playboy claims that 177 checks were issued with Legends B and C and that Nagel signed 89 of these. Dumas claims that in addition to the 64 checks that Nagel did not sign, there are 36 works in this time period for which no check exists or the identity of the endorser of an existing check can not be determined. Playboy thus claims that this remand concerns "the remaining 88 or so checks" while Dumas seems to argue

that checks for 100 works can not be shown to have been endorsed by Nagel.

All of the checks that were not signed by Nagel were endorsed either by the firm of Elias Berman, the firm of Leon Rootenberg, or Nagel Studios, Inc. Playboy concentrates its actual authority arguments on the Elias and Rootenberg firms, which both the Second Circuit and Dumas referred to as Nagel's accountants. As to the checks signed by Nagel Studios, Inc., Playboy argues that since its communications to Nagel Studios were conducted through the Rootenberg firm, its agents must have endorsed the checks made out to Nagel Studios.

■ Both parties agree that the law of California controls this dispute. Under California law, actual authority and its scope need not be express and "is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." 10A CAL.CIV.CODE § 2316 (West 1985). An agent has authority also "[t]o do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency." Id. § 2319. An agency may be created either though authorization or ratification, and ratification need not be express but may be inferred from the circumstances. Id. § 2307; see also Rakestraw v. Rodrigues, 8 Cal.3d 67, 104 Cal.Rptr. 57, 500 P.2d 1401 (1972).[7]

---

**6.** The Court found that the language used by Playboy in the legend agreements from January 1, 1978 to July 1979 (which it referred to as Legend A) was not sufficient to meet the writing requirement, and concluded that the works created in this time period were not works-for-hire. Id., at 560–61.

**7.** The creation of agencies is limited in some circumstances by California's "equal dignities" rule, which provides that "an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing." 10A CAL.CIV.CODE § 2309 (West 1985). Dumas claims that Nagel's agents lacked actual authority because "[f]or each work for hire agreement allegedly entered by Playboy and Nagel on or after January 1, 1978.. the 1976 Act required the agreement to be in writing, and the equal dignities rule therefore required the authority of Nagel's alleged agents to be in writing." (Def. Reply Br. 27) The parties have stipulated that no such written authorizations exist.

Playboy has objected, in an April 16, 1996 letter to the Court, to Dumas' maintenance of this argument because she raised it for the first time in her reply memorandum, thereby depriving Playboy of a chance to respond to her position. Playboy correctly points out that Dumas' initial memorandum contained no discussion of the law governing the actual authority issues, and did not even hint that Dumas might argue that the equal dignities rule applies in this case. It would be manifestly unfair to allow Dumas to make a complex and possibly dispositive argument after Playboy's opportunity to respond has passed, thereby silencing Playboy on the issue and depriving the Court of Playboy's views on the question raised. The California equal dignities rule existed well before Dumas filed her initial memorandum, and the Court is aware of no reason for Dumas' manipulative omission of the argument from her first submission. Arguments made for the first time in a reply brief need not be considered by a court. Pyramyd Stone International

Playboy presents two arguments in support of its claim that the endorsers had actual authority to enter into a work-for-hire agreement on behalf of Nagel. It argues first that because the endorsers were "business managers" for Nagel whose powers included endorsing and depositing payment checks, they had the power to bind Nagel to work for hire arrangements. The second claim is that Nagel's eventual endorsement of checks bearing Legend B or C ratified the actions of his agents because he must have known that their previous endorsements would have come under legends that were identical in substance.

■ Agency ordinarily is an issue of fact under California law. *In re Nelson*, 761 F.2d 1320, 1322 (9th Cir.1985). Playboy does not suggest an express grant of authority from Nagel to any of the endorsers to enter into a work for hire agreement. Hence it must show that the alleged agents had implied actual authority.[8] Under California law, an essential element of implied actual authority is the agent's belief that it possesses such authority. As the Supreme Court of California stated in *Columbia Outfitting v. Freeman*, 36 Cal.2d 216, 219, 223 P.2d 21, 24 (1950), "[t]here could be no implied authority unless ... the agent, believed he had such authority." *Accord, Penthouse International Ltd. v. Barnes*, 792 F.2d 943, 947 (9th Cir. 1986) (implied actual authority requires agent's belief that action is authorized to engage in the conduct and reasonable basis for that belief) (citing *Columbia*); *South Sacramento Drayage Co. v. Campbell Soup Co.*, 220 Cal.App.2d 851, 856, 34 Cal.Rptr. 137, 140 (1963).

■ There is no evidence suggesting that any of the endorsers believed that it had the authority to bind Nagel to a work for hire agreement. In fact, what evidence there is shows that the agents believed that such action was outside of the limited scope of their agency. Elias stated in his deposition that Nagel asked him to "put my money in the bank, make my payments and keep my books so at the end of the year you can do my tax return." (JA 3619) In the same deposition. he stated that "[i]f I had any authorization at all, it would have been a limited power of attorney to deposit his checks and pay his bills and prepare tax returns. That would be it if I had that at all." (JA 3643) Playboy points to no evidence regarding the Rootenberg firm's beliefs about its authorization, and this Court finds that none of the firms believed it had authorization of the sort Playboy claims existed.

Playboy maintains that because the accounting firms claimed to be Nagel's business managers, they believed that had the authority to bind him to the legend agreements. Playboy fails to present a persuasive reason why a "business manager" would believe that it had the power to bind its principal in professional agreements simply by virtue of its title. This is particularly true in the case of Elias, whose own understanding of his agency contradicts Playboy's argument.[9] Playboy has not met its burden of showing that the agents believed that they possessed the actual authority in question.

Playboy argues next that Nagel's accountants must have had the power to bind him to

v. *Crosman Corp.*, 95 CIV. 6665, 1997 WL 66778 *17–18 n. 3 (S.D.N.Y.1997) (Keenan, J.); *Cumis Insurance Society v. Citibank*, 921 F.Supp. 1100, 1110 n. 7 (S.D.N.Y.1996) (Koetl, J.); *Chase Manhattan Bank v. T & N plc*, 905 F.Supp. 107, 122 n. 5 (S.D.N.Y.1995) (Koetl, J.); *Sigmon v. Parker, Chapin, Flattau & Klimpl*, 901 F.Supp. 667, 677 n. 5 (S.D.N.Y. 1995) (Leisure, J.) (citing cases); *see also Keefe v. Shalala*, 71 F.3d 1060, 1066 n. 2 (2d Cir. 1995); *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993); *NLRB v. Star Color Plate Service*, 843 F.2d 1507, 1510 n. 3 (2d Cir.1988) (all holding that issue first raised in appellate reply brief need not be considered by appellate court). Although as a general rule all meritorious arguments should be considered in ruling

on a case, Dumas' behavior should not be rewarded. The Court therefore will not consider her equal dignities argument. Moreover, consideration of the point is unnecessary given the Court's conclusion on the actual authority issue.

8. In its brief, Playboy vaguely refers to "actual authority" when it means actual implied authority and refers to actual express authority as "express authority."

9. Though the use of such terminology might lead outsiders to believe that the agents had authority, such apparent or ostensible authority is not in issue in this case.

an employment agreement because an agent under California law has "authority ... to do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of [their] agency." Though it never explains its argument on this point fully, Playboy appears to claim that since Nagel's agents had authority to endorse and deposit his checks, and since the endorsements were affixed to checks bearing the legends, the agents must have had the authority to enter into those agreements. The theory evidently is that they could not endorse the checks, which was their job, without agreeing to the legends—so they must have been authorized to agree to the legends. This argument ignores Elias' uncontradicted testimony that his grant of authority was very specific and limited. In addition, the argument overlooks the consensual nature of agency. Absent proof that Nagel knew that the agents could not endorse the checks without committing him to a work-for-hire relationship, it cannot be said that the authority to endorse the checks carried with it the authority to do so.

 Playboy next argues that Nagel ratified the unauthorized actions of his agents by signing and depositing a number of checks bearing the legend agreements in question. A principal of course may ratify the unauthorized actions of an agent, and a ratification may be express or inferred from the facts surrounding the transaction. However, any ratification requires that the purported principal intended to adopt or consent to the unauthorized action *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 104 Cal.Rptr. 57, 500 P.2d 1401 (1972). In addition, "[r]atification requires full knowledge by the principal of all of the material facts at the time of the act of ratification." *Dufresne v. Elite Ins. Co.*, 26 Cal.App.3d 916, 926, 103 Cal.Rptr. 347, 354 (1972). Playboy fails to demonstrate that a ratification took place in this case.

 Playboy asserts that because Nagel endorsed 81 checks bearing Legend C after the last check was endorsed by one of his agents, he must have known of and consented to his agent's earlier endorsements. It maintains that because he never complained about the actions taken by his agents, he ratified their unauthorized assent to the legend agreements.

Playboy points to no persuasive evidence showing that Nagel knew that his agents signed the legends before he did. He reasonably might have assumed that work-for-hire agreements were sent only to him personally because only he could sign them. He may never have thought of the issue at all. Hence, while a ratification may be implied from the circumstances surrounding a transaction, Playboy has failed to show that Nagel even knew that his agents signed checks bearing legend agreements. The Court finds the evidence inadequate to infer that Nagel ratified the earlier endorsements. Moreover, even if Nagel did know that his agents had signed the legends, there is no proof that he knew which of the legends, A, B, or C, his agents endorsed. Nagel himself signed checks bearing Legend A, which is insufficient to satisfy the 1976 Act writing requirement. Therefore, even if he believed that his agents signed checks bearing a legend, he might have believed that they signed checks bearing Legend A, which would not satisfy the writing requirement. His subsequent silence then at most would have ratified only an endorsement of Legend A. Playboy simply failed to prove that the facts surrounding Nagel's endorsement of checks bearing Legend C constitute "conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred." *Rakestraw*, 8 Cal.3d, at 74, 104 Cal.Rptr. at 61, 500 P.2d 1401. Its implied ratification argument is therefore rejected.

This Court finds that none of the persons who endorsed the payment checks as Nagel's agents had actual authority to bind him to a work for hire agreement. Thus, only those checks which Nagel himself signed satisfied the 1976 Act writing requirement.

## II. Transfer

 The final subject of the remand to this Court is a determination of whether Nagel transferred the copyrights to any of the disputed works to Playboy by means of the legends that appeared on Playboy's payment checks. The only works for which this issue arises are those works for which Nagel

did not endorse the payment checks personally. Section 204 of the Copyright Act requires that any copyright transfer be made by the owner or his "duly authorized agent." 17 U.S.C. § 204(a) (1996). The agents that signed these checks lacked authority to bind Nagel to a work for hire agreement. For the same reasons, they lacked authority to transfer Nagel's copyrights to Playboy.[10] Thus, the copyrights in these paintings were not transferred by Nagel's agents.

### III. Playboy's Motion to Reopen the Record

■ Playboy has moved the Court for leave to supplement the record. The evidence it seeks to present relates to the issue of which party was the motivating factor in the creation of the disputed works. Inasmuch as Playboy is the prevailing party on the motivating factor issues, its application is moot. In any case, Playboy's motion lacks merit for two reasons.

■ First, "[a]n application to reopen the record ordinarily will be denied unless the party seeking to expand the record failed to adduce the evidence sought to be added notwithstanding its own due diligence." *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 926 F.Supp. 371, 372 (S.D.N.Y. 1996) (citing *John v. Sotheby's Inc.*, 858 F.Supp. 1283, 1288–89 (S.D.N.Y.1994), *aff'd*, 52 F.3d 312 (2d Cir.1995)). Playboy argues that its motion is not foreclosed. It argues that "the evidence in question was not offered at trial" because "the issues to which [the proposed supplemental evidence is] now relevant did not seem seriously disputed at trial and because of a desire to comply with the trial court's guidance as to how the trial should be conducted." (Pl.Mem. to Reopen. 5)

Almost all of Playboy's supplementary evidence goes to the motivating factor issue. Contrary to Playboy's assertion, the motivating factor was seriously disputed at trial. Although the district court's decision did not reach the issue, the parties introduced extensive evidence on the point. Diligence in this

situation would have dictated that all the relevant evidence be introduced at trial. A tactical decision not to do so which later seems disadvantageous is not a proper basis to reopen the record.

Even if its proffered evidence were before the Court, it would not alter the result. As noted above, the proposed supplementary evidence goes to the motivating factor issue. Having examined the plaintiff's proposed supplemental evidence, the Court finds that it is basically cumulative and would shed substantially no light on the issues before it. Playboy's motion to supplement the record is denied.

### Conclusion

For the reasons stated above, the works created after January 1977 but before January 1, 1978 were made at Playboy's instance. Because there is no agreement to the contrary, Playboy is the owner of the copyright to these works. The works created after July 1979 also were made at Playboy's instance. However, the 1979 Act writing requirement was not satisfied for many of these works because the payment checks for the works were not signed by Nagel himself and those who purportedly signed on his behalf lacked actual authority to enter into work-for-hire agreements on his behalf. These works therefore are not works for hire under the 1976 Act. Because the Court finds that there was no transfer of any of the works made outside of the for hire relationship, Dumas owns the copyrights to the 1976 Act works for which Nagel himself did not sign the payment checks. Finally, Playboy's motion to reopen the record is denied.

Within ten days of the date of this opinion Playboy shall notice for settlement on seven days notice a proposed form of judgment. The proposed judgment shall enumerate each of the disputed works and contain appropriate decretal language determining its ownership. The foregoing contains the

---

**10.** Estoppel principles, including actual authority, may not be used to establish copyright ownership in an infringement claim. *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 828 (8th Cir.1992); see also Fitzgerald Publishing Co. v. Baylor Publishing Co., 807 F.2d 1110 (2d Cir.1986). Thus, Playboy must prove that Nagel's agents had actual authority to transfer.

Court's findings of fact and conclusions of law.

SO ORDERED.